# FOR PUBLICATION



**FILED**
May 21 2014, 6:50 am

CLERK
of the supreme court,
court of appeals and
tax court

<u>ATTORNEY FOR APPELLANT</u>:

**JOSEPH E. MORRISON**
Roselawn, Indiana

<u>ATTORNEYS FOR APPELLEE</u>:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CYNTHIA L. PLOUGHE**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

JACOB HERRON,                           )
                                        )
    Appellant-Defendant,           )
                                        )
        vs.                 )    No. 56A03-1306-CR-210
                                        )
STATE OF INDIANA,                       )
                                        )
    Appellee-Plaintiff.            )

APPEAL FROM THE NEWTON SUPERIOR COURT
The Honorable Daniel J. Molter, Judge
Cause No. 56D01-1205-FB-3

**May 21, 2014**

**OPINION - FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

Trials should primarily proceed on the basis of in-court testimony, not statements or affidavits obtained before trial. Yet at Jacob Herron's trial for burglary and receiving stolen property, the State called a witness solely to impeach her with a pretrial statement, and did so by reciting segments of that statement. Because this statement was admitted solely for impeachment, the jury could not use it as substantive evidence. But given the lack of evidence against Herron, we conclude that the jury did rely on this evidence to convict him. For this reason, we reverse Herron's convictions.

**Facts and Procedural History**

One evening in March 2012, Teresa Beever went to Earl's restaurant in Brook, Indiana, for dinner. When Beever returned home, she noticed that a window had been broken and pushed in, so she called police. After authorities allowed Beever to inspect her home, she reported jewelry and other valuables missing.

During their investigation, authorities spoke to Herron's girlfriend, Kelly Tebo, who gave a statement implicating Herron. Tebo said that she was waitressing at Earl's on the night of the break-in. While at work, Tebo said she sent Herron a text message implying that the Beever home was unoccupied because Teresa Beever was eating at Earl's and her husband Reid was out of town. Tebo also said that when she saw Herron after her shift, he was carrying two bags, one of which he said contained things stolen from the Beever home. Herron was arrested and charged with Class B felony burglary and Class D felony receiving stolen property.

At Herron's jury trial, the State offered three glove prints found at the Beever home into evidence. Sergeant Duane Datzman, the crime-scene technician who processed the prints, testified that the prints appeared to have a "series of letters," an "'M' and possibly 'e,' 'c.'" Tr. p. 168. From this, Sergeant Datzman concluded that the gloves that left the prints were "the brand Mechanic or Mechanix." *Id.* When asked how widely Mechanix-brand gloves are sold, Sergeant Datzman said he did not know. *Id.* at 202. The State then admitted four pairs and one single black Mechanix-brand glove recovered from Herron's house. *Id.* at 211-12. The town marshal, Charles Flahive, testified that the single glove taken from Herron's house was "capable" of leaving the crime-scene prints. *Id.* at 214. When asked how widely Mechanix-brand gloves are sold, Marshal Flahive also said he did not know. *Id.* at 215-16.

The State then called Tebo as a witness. When Tebo took the stand, she confirmed that she was waitressing at Earl's on the night of the break-in. She also confirmed that she texted Herron to make "small talk" during her shift, but she said that she did not say anything about the Beevers. *Id.* at 227-28. She explained that after her shift ended, she and Herron traveled out of town for a bridal shower, and Herron brought luggage that she recognized as his. *Id.* at 228-29. Tebo said that Herron said nothing about stolen items from the Beever's. *Id.* at 229.

The State sought to impeach Tebo with her pretrial statement over Herron's objection. Although counsel for the State admitted that he could not "sit here and read line[-]for[-]line what her [pretrial] statement says," *id.* at 239, he proceeded to do just that:

3

THE STATE: Ms. Tebo, before we took a break I was asking you a question regarding . . . your written statement . . . . [I] believe I asked you at that point [if] the [written] statement actually said that [] Herron had texted me asking if the Beevers were eating dinner. Do you remember me asking that question?

TEBO: I do remember.

THE STATE: And your written statement in fact does say that, does it not?

TEBO: It does say that.

THE STATE: And that's not the way you testified today, is it?

TEBO: That is not. That isn't accurate.

THE STATE: The same written statement goes on to say that "I let [Herron] know though a text message that Teresa Beever was at [the restaurant] with her friend and that Reid Beever was out of town." There's no disagreement that your written statement [] said that, is that correct?

TEBO: The statement I wrote saying that Teresa Beever . . . that is incorrect.

THE STATE: I'm just trying to make sure everything is clear. The portion of the statement that I just read to you—

TEBO: Could you repeat that?

THE STATE: I will. We don't have a dispute, do we, that the statement, the written statement that you gave . . . says, "I let [Herron] know though a text message that Teresa Beever was at [the restaurant] with her friend and that Reid Beever was out of town." The written statement that you hold in your hand says that, does it not?

TEBO: It does say that.

4

THE STATE:          And that's not what you testified to today, is it?

TEBO:               Correct.

THE STATE:          I think you also testified today that you did not text [Herron] and tell him that Teresa Beever was leaving [the restaurant]?

TEBO:               That is correct.

THE STATE:          But in your written statement . . . you in fact said, "I text[ed] [Herron] and told him that Teresa was leaving [the restaurant]."

TEBO:               I did write that. And that is incorrect as well.

THE STATE:          As I recall, your earlier testimony after you had gotten off of work that evening, you went back to your residence that you share with [Herron] . . . and the two of you then got in [a vehicle] . . . and then going up to [sic] Gary?

TEBO:               We did.

THE STATE:          And that [Herron] had thrown a couple bags into the vehicle prior to you leaving?

TEBO:               Right. He loaded the vehicle.

THE STATE:          Okay. Today you testified that [Herron] – I'm sorry, that you didn't know what was in either of those bags and that [Herron] had not told you what was in those bags?

TEBO:               I don't remember testifying to that exactly. If I recall, you asked if [Herron] said what was in the bags.

THE STATE:          Okay and you said no?

TEBO:               And I said no. I assumed what was in there was our clothes.

5

THE STATE: On your written statement though . . . you indicated that he told me one bag was change [sic] and one bag was stolen stuff from the Beever's home.

TEBO: I did write that.

*Id.* at 253-54. When asked if she ever discussed the burglary with anyone other than the authorities, Tebo said no. *Id.* at 255. Later, however, the State called Teresa Beever as a witness. Over Herron's objection, Beever testified that she spoke to Tebo before the trial, and Tebo admitted texting Herron on the night of the burglary when Beever arrived at Earl's and when she left. *Id.* at 303. Beever also testified that "[Tebo] told me that she picked [Herron] up at their home and he got in the car and threw a couple of bags in the backseat and stated that the bags contained coins and stuff from our house." *Id.*

The jury convicted Herron of Class B felony burglary and Class D receiving stolen property. Herron was sentenced to fifteen years for burglary and eighteen months for receiving stolen property, to be served concurrently. Herron now appeals.

**Discussion and Decision**

Herron contends that the trial court erred in allowing the State to impeach Tebo. His argument is three-fold: the State put Tebo on the stand solely to impeach her, which is impermissible; the State's method of impeachment was improper; and the jury used impeachment evidence as substantive evidence in convicting him, which is also impermissible.

We review a trial court's decision regarding the admission of evidence for an abuse of discretion. *Gray v. State*, 982 N.E.2d 434, 437 (Ind. Ct. App. 2013) (citation omitted). An abuse of discretion occurs when the trial court's ruling is clearly against the

6

logic, facts, and circumstances presented. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.*

The State certainly had the right to impeach Tebo, its own witness. *See* Ind. Evidence Rule 607. But the State may not put a witness on the stand for the sole purpose of introducing otherwise inadmissible evidence cloaked as impeachment. *Appleton v. State*, 740 N.E.2d 122, 124 (Ind. 2001); *see also Griffin v. State*, 754 N.E.2d 899, 904 (Ind. 2001) ("[T]he rule allowing a party to impeach his own witness may not be used as an artifice by which inadmissible matter may be revealed to the jury through the device of offering a witness whose testimony is or should be known to be adverse in order, under the name of impeachment, to get before the jury a favorable extrajudicial statement previously made by the prior witness."), *aff'd on reh'g,* 763 N.E.2d 450 (Ind. 2002), (citation omitted). We must therefore determine whether calling Tebo as a witness served any legitimate non-impeachment purpose.

Our Courts have declined to find that a witness was called for the sole purpose of impeachment where the witness observed the underlying crime and provided, on the stand, other relevant testimony. *See Appleton*, 740 N.E.2d at 125 (impeached witness owned the home where the events at issue began and observed the attack on the victims); *Edmond v. State*, 790 N.E.2d 141, 146 (Ind. Ct. App. 2003) (witness was present at the scene of the crime and gave a first-hand account of the event), *trans. denied*; *Kendall v. State*, 790 N.E.2d 122, 127 (Ind. Ct. App. 2003) (impeached witness saw shooting that gave rise to trial for attempted murder), *trans. denied.* But Tebo did not witness the burglary of the Beever home. And we are not persuaded by the State's argument that

7

Tebo's testimony was needed to corroborate Marshal Flahive's testimony that he spoke to her and that the interview provided the information necessary for a search warrant. Appellee's Br. p. 7. This is course-of-investigation evidence, which we have recognized as generally irrelevant in that it does not make it more or less probable that the defendant committed the crime alleged. *Kindred v. State*, 973 N.E.2d 1245, 1255 (Ind. Ct. App. 2012), *trans. denied*.

Put simply, the record belies the State's argument that Tebo's testimony served a legitimate non-impeachment purpose. The State knew before trial that Tebo's testimony would be inconsistent with her pretrial statement.[1] Tebo's direct examination spans thirty-five pages, thirty of which pertain to her pretrial statement, and the remaining pages do not contain substantive testimony. These facts, when considered in light of the minimal evidence tying Herron to the burglary, lead us to conclude that the State's only purpose in calling Tebo as a witness was, in fact, impeachment. *See Griffin*, 754 N.E.2d at 904-05 (defense witness called solely for impeachment where he did not witness any of the relevant events, did not provide any substantive testimony, and the defense's actions indicated a singular intent to impeach).

Herron also argues that the State's method of impeachment was improper. We agree. Tebo readily admitted that her testimony was inconsistent with her pretrial statement. Despite admitting herself a liar, the State drove the point home by reading, line-by-line, from her pretrial statement. *Supra* p. 4-6. This was improper and

---

[1] *See* Tr. p. 233 (Tebo: "I told the [prosecutor] that when I came to court, that I was going to be honest and tell the truth under oath. . . . [I] told him what I was going to say."), 235 (Defense counsel: "[T]he State . . . knew after talking to [Tebo] on Friday this is what she was going to say. They called her to the stand today knowing what she was going to say . . . that's why [the State] spoke about the statement in opening to get this inadmissible hearsay in.").

unnecessary. *See Appleton*, 740 N.E.2d at 126 ("Once [the witness] admitted that he made a police statement prior to trial that was inconsistent with his testimony . . . impeachment was complete. [The witness] had admitted himself a liar. Reciting segments of [the] pretrial statement was thus superfluous. The only purpose such recitation could have would be to get the details of [the witness's] former statement before the jury as substantive evidence . . . .") (citation omitted); *see also Martin v. State*, 779 N.E.2d 1235, 1245 (Ind. Ct. App. 2002) ("[T]he State basically led [the witness] through his prior statement and in that way, used the statement as substantive evidence rather than impeachment evidence. We agree [] that this was improper. The trial court should not have allowed the State to conduct its direct examination [] in this way."), *trans. denied*.

But that does not end our inquiry; we are to disregard errors in the admission of evidence as harmless unless they affect a party's substantial rights. *VanPatten v. State*, 986 N.E.2d 255, 267 (Ind. 2013) (citations omitted). "In determining whether error in the introduction of evidence affected the defendant's substantial rights, this Court must assess the probable impact of the evidence upon the jury." *Id.* (citation omitted). When a conviction is supported by substantial evidence of guilt sufficient to satisfy this Court that there is no substantial likelihood that the questioned evidence contributed to the conviction, the error is harmless. *Ware v. State*, 816 N.E.2d 1167, 1175 (Ind. Ct. App. 2004) (citation omitted).

To convict Herron of Class B felony burglary, the State had to prove that he broke and entered the Beever home with the intent to commit a felony inside, *see* Ind. Code §

9

35-43-2-1, and to convict him of receiving stolen property, the State had to prove that he knowingly or intentionally received, retained, or disposed of the Beever's stolen property, *see* Ind. Code § 35-43-4-2(b). The State offered the following substantive evidence at Herron's trial:

- Glove prints from the Beever home that appeared to have a "series of letters," an "'M' and possibly 'e,' 'c,'" leading the crime-scene technician to conclude that the prints were from Mechanic or Mechanix-brand gloves;
- Four pairs and one single black Mechanix-brand glove recovered from Herron's house;
- Marshal Flahive's testimony that a glove taken from Herron's house was "capable" of leaving the crime-scene prints;
- Tebo's testimony that she worked the night of the break-in and texted Herron during her shift but said nothing about the Beevers; and
- Tebo's testimony that after her shift ended, she and Herron traveled out of town for a bridal shower, and Herron brought luggage that she recognized as his.

Critically, the jury could not use Tebo's pretrial statement as substantive evidence against Herron because it was admitted solely for impeachment. *See Lawrence v. State*, 959 N.E.2d 385, 389 (Ind. Ct. App. 2012) (evidence admitted only for impeachment may not be used as substantive evidence) (citation omitted), *trans. denied*. But when a witness is impeached as Tebo was—by reciting portions of the witness's pretrial statement—there is a very real threat that the impeachment evidence will be used as substantive evidence. *See Appleton*, 740 N.E.2d at 126 ("Reciting segments of [the] pretrial statement was [] superfluous. The only purpose such recitation could have would be to get the details of [the] former statement before the jury as substantive evidence . . . ."); *Martin*, 779 N.E.2d at 1245 ("[T]he State basically led [the witness] through his prior statement and in that way, used the statement as substantive evidence rather than impeachment evidence.").

That danger was certainly present in this case, where the evidence against Herron was insubstantial and wholly circumstantial. And that danger only increased when—after it had already impeached Tebo with her pretrial statement—the State used Teresa Beever to impeach Tebo further about statements she made before Herron's trial. *Supra* p. 6. Having reviewed the record, including the evidence set forth above, we must conclude that the jury used impeachment evidence as substantive evidence in this case.[2] Because the questioned evidence contributed to Herron's convictions, his convictions must be reversed.[3] *See Ware*, 816 N.E.2d at 1175.

This conclusion leads us to the question of whether the State may retry Herron. Where the evidence actually presented at trial is insufficient as a matter of law to sustain a conviction, the defendant may not be retried on those charges. *Rhone v. State*, 825 N.E.2d 1277, 1285 (Ind. Ct. App. 2005) (citing *Carpenter v. State*, 786 N.E.2d 696, 705 (Ind. 2003)), *trans. denied*. However, "if all the evidence, *even that erroneously admitted*, is sufficient to support the jury verdict, double jeopardy does not bar a retrial on the same charge." *Id.* (emphasis added) (citations omitted). The United States Supreme Court has explained why this is so:

> A reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary "trial errors" as the "incorrect receipt or rejection of evidence." While the former is in effect a finding "that the government has

---

[2] We acknowledge that the trial court instructed the jury that Tebo's pretrial statement was not to be used as substantive evidence, *see* Tr. p. 268, and a jury is presumed to follow a trial court's instructions. *Morgan v. State*, 903 N.E.2d 1010, 1019 (Ind. Ct. App. 2009), *trans. denied*. But after reviewing the record and in light of the dearth of evidence against Herron, we must conclude that the jurors did not follow the court's instruction.

[3] Because we reach this conclusion, we do not address Herron's claims regarding certain comments made by the trial court.

11

> failed to prove its case" against the defendant, the latter "implies nothing with respect to the guilt or innocence of the defendant," but is simply "a determination that [he] has been convicted through a judicial process which is defective in some fundamental respect."

*Lockhart v. Nelson*, 488 U.S. 33, 40 (1988) (quoting *Burks v. United States*, 437 U.S. 1, 14-16 (1978)). Put differently, had the trial court sustained Herron's impeachment objections, the State would have been put on notice that it needed to present additional evidence to support the charges against Herron.

Because there was evidence—albeit inadmissible—to establish that Herron committed the charged crimes, the State may retry him.

Reversed.

MAY, J., concurs.

RILEY, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JACOB HERRON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 56A03-1306-CR-210 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

**RILEY, Judge, dissenting.**

I respectfully concur in part and dissent in part. While I agree with the majority that the State's procedure for impeaching the witness might have been improper, the error was harmless. Though no direct evidence was presented at trial, I find that there was enough circumstantial evidence to prove Herron committed the offenses.

It is well established that "circumstantial evidence will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *Pratt v. State,* 744 N.E.2d 434, 437 (Ind. 2001). Tebo testified at trial that she worked at Earl's on the night of the burglary and that she texted Herron while she was on duty. Tebo also testified that after getting off from work that night, she met with Herron at her residence, and he put two bags in the car. When

13

Tebo met with Marshal Flahive on May 22, 2012, she implicated Herron to the burglary and thereafter a search warrant was issued. During their search of Herron's residence, the officers found several gloves and one of the gloves matched the photographic imprint taken at the Beever's residence. Lastly, Marshal Flahive testified at trial that one of the gloves found at Herron's residence had letters on the back that matched the glove imprint found on the opened patio door at Beever's residence.

As such, it is only proper to conclude that the jury might have reasonably inferred from the evidence presented at trial that: Tebo texted Herron that night stating Beever was at the restaurant having dinner, hence her house was unoccupied; the gloves found at Herron's residence were used to break and enter into the Beever's residence; and that two bags Herron put in his car that night, might have contained stolen items from Beever's residence. Thus, I conclude that sufficient evidence of probative value exists from which the jury could have found Herron guilty beyond a reasonable doubt of burglary and receiving stolen property. Moreover, I find that even though the evidence was wholly circumstantial, I presume that the jury followed the trial court's instructions, and only considered the circumstantial evidence.

Lastly, I disagree with the majority's argument that the State knew that Tebo was going to recant her prior out-of-court written statement, thus making her an invaluable witness. The record shows that Tebo was a valuable witness even if determined to recant her written statement. I therefore agree with the State's argument that had the State not called Tebo as a witness, the jury would have wondered why such a valuable witness was being kept away from the stand. *See Impson v. State*, 721 N.E.2d 1275, 1282. (Ind. Ct.

14

App. 2000). For these reasons, I find that the trial court did not abuse its discretion in permitting the State to call Tebo as a witness.